**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION**

MAR 30 2018

JAMES W. McCORMACK, CLERK
By: _____
DEP CLERK

TRACEY SCOTT AND LORRENZO HAMPTON,
INDIVIDUALLY AND ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED

**PLAINTIFFS**

VS.

CASE NO.: _3:18-cv-00056  JLH_

REVCLAIMS, LLC and
ST. BERNARD'S HOSPITAL, INC.

**DEFENDANTS**

This case assigned to District Judge _____Humes_

and to Magistrate Judge_____Ray

**CLASS ACTION COMPLAINT**

Comes now Plaintiffs, Tracey Scott and Lorrenzo Hampton, Individually and on Behalf

of All Others Similarly Situated, by and through his undersigned attorneys, Lacy Law Firm and

Jeff Scriber, P.A., and for his Class Action Complaint against Defendants, RevClaims LLC and

St. Bernard's Hospital, Inc., states and alleges the following:

**PARTIES, JURISDICTION, AND VENUE**

1.      Plaintiff Tracey Scott is an individual resident of Craighead County, Arkansas.

2.      Plaintiff Lorrenzo Hampton is an individual resident of Craighead County,

Arkansas.

3.      Defendant RevClaims, LLC (hereinafter "RevClaims") is a foreign limited

liability company with a principal place of business in a state other than Arkansas. RevClaims's

registered agent for service of legal process is The Corporation Company, 124 West Capitol

Avenue, Suite 1900, Little Rock, AR 72201.

4.      Defendant St. Bernard's Hospital, Inc. (hereinafter "St. Bernard's") is an

Arkansas corporation with a principal place of business in Arkansas. St. Bernard's registered

agent for service of legal process is Ralph W. Waddell, 225 East Jackson, Jonesboro, AR 72401.

5.      This Court has subject matter jurisdiction over this action due to the amount and type of relief sought and because the amount in controversy exceeds the minimum jurisdictional limits of this Court. In addition, this lawsuit is a companion case that closely mirrors the allegations and issues considered by this Court in *Sue Garrison, Individually and On Behalf of All Others Similarly Situated v. RevClaims, LLC, Avectus HealthcareSolutions, LLC, St. Bernard's Hospital, Inc., St. Bernard's Community Hospital Corporation, Shelby County Healthcare Corporation d/b/a Regional Medical Center and d/b/a Regional One Health, Baptist Health, Baptist Health Hospitals, Lawrence Memorial Hospital, White River Health Systems, Inc., and John Does 1-100*; U.S.D.C., Eastern District of Arkansas Case No. 3:16-cv-00253, jurisdiction and venue in this Court are appropriate.

6.      This Court has personal jurisdiction over the Defendants pursuant to Ark. Code Ann. § 16-4-101 as all Defendants have had more than minimum contacts with the State of Arkansas and have availed themselves of the privilege of conducting in business in this State. In addition, as explained below, Defendants have committed affirmative acts within the State of Arkansas which give rise to civil liability.

## GENERAL ALLEGATIONS

### A. Tracey Scott's and Lorrenzo Hampton's Motor Vehicle Collision

7.      Tracey Scott and Lorrenzo Hampton were involved in a motor vehicle collision in Craighead County, Arkansas on April 2, 2015. Tracey Scott and Lorrenzo Hampton were both occupants of a vehicle owned by Tracey Scott and driven by Lorrenzo Hampton. The driver of the at-fault vehicle, Kevin Sartin, was a resident of the State of Arkansas.

8.  Both Scott and Hampton experienced pain in their back soon after the collision. With the pain gradually increasing, both Scott and Hampton presented to St. Bernard's Medical Center emergency room on April 4, 2015 for evaluation and treatment of their injuries.

9.  Both Scott and Hampton were, at all times relevant to this suit, members and beneficiaries of a policy of Arkansas Blue Cross Blue Shield ("BCBS") health insurance purchased through Arkansas' private option marketplace exchange.

10.  Upon admission to St. Bernard's, and as a condition of Scott's and Hampton's admission to St. Bernard's, St. Bernard's was assigned all rights belonging to Scott and Hampton as BCBS members.  This included an assignment of benefits authorizing St. Bernard's to bill BCBS directly and to receive direct reimbursement from BCBS for medical services provided to Scott and Hampton.

11.  The assignment language states: "Assignment of Insurance Benefits: I certify that the information given by me applying for payments under Titles XVIII and XIX of the Social Security Act, or under other insurance coverage, is correct.  For Title XIX beneficiaries, I understand that I must provide my Medicaid number at the time of admission, otherwise I may be billed as a private pay patient.  I request that payment of authorized benefits be made on my behalf to the *Medical Center* and other entities providing services which include, but is not limited to Laboratory, Anesthesiology, Radiology, Emergency Services and Pathology."

12.  The admission agreement further states "The undersigned, whether he/she is the patient or signing as the patient's authorized representative, hereby further agrees that the patient shall be personally responsible for any and all charges **not paid pursuant to the above assignment of insurance benefits**." (emphasis added).

3

13.     The "standard" charges for treatment provided to Tracey Scott by St. Bernard's, without reducing the amount as required by St. Bernard's contract with BCBS, equaled $1,334.00. The "standard" charges for the treatment provided to Lorrenzo Hampton at St. Bernard's, without reducing the amount as required by St. Bernard's contract with BCBS, totaled $472.00.

14.     St. Bernard's contracted with RevClaims for the collection of both accounts.

15.     Following their release from treatment, both Scott and Hampton pursued claims against the at-fault driver responsible for the motor vehicle collision, and his liability insurer, National Liability and Fire.  Ultimately, National Liability and Fire offered a confidential amount to settle Ms. Scott's and Mr. Hampton's tort claims against its insured.

16.     St. Bernard's and RevClaims asserted their right to collect the full amount of St. Bernard's bills, $1,334.00 and $472.00, and notified Tracey Scott and Lorrenzo Hampton, through their counsel, of their intent to collect the full amount from Ms. Scott and Mr. Hampton. St. Bernard's did not bill these services to BCBS for payment.

17.     St. Bernard's was advised both Scott and Hampton were insured and was instructed to bill BCBS for reimbursement for the medical services provided.  *See* **Exhibit 1.**

18.     RevClaims and St. Bernard's refused to submit Tracey Scott's bill to BCBS, and instead asserted a lien amount for the full charge associated with this treatment.  *See* **Exhibit 2.**

19.     Because RevClaims refused to bill BCBS and impaired Tracey Scott's third-party liability claim, and because Defendants misrepresented to Tracey Scott and her counsel her responsibility for payment, Tracey Scott agreed to pay RevClaims $1,133.90 for the St. Bernard's bill.  This payment was made on January 27, 2016, more than six months after the treatment was provided.  Because RevClaims and St. Bernard's had not submitted the bill to

4

BCBS within the contractually-required six-month timeframe for doing so, Tracey Scott owed the hospital nothing in the form of a co-pay or deductible. Thus, RevClaims and St. Bernard's misrepresented the extent of Tracey Scott's liability to the hospital at the time it accepted payment from her. *See* **Exhibit 3**.

20.     RevClaims and St. Bernard's refused to submit Lorrenzo Hampton's bill to BCBS. Because RevClaims refused to bill BCBS and impaired Lorrenzo Hampton's third-party liability claim, and because Defendants misrepresented to Lorrenzo Hampton and his counsel his responsibility for payment, Lorrenzo Hampton agreed to pay RevClaims $401.75 for the St. Bernard's bill. This payment was made on January 6, 2016, more than six months after the treatment was provided. Because RevClaims and St. Bernard's had not submitted the bill to BCBS within the contractually-required six-month timeframe for doing so, Lorrenzo Hampton owed the hospital nothing in the form of a co-pay or deductible. Thus, RevClaims and St. Bernard's misrepresented the extent of Lorrenzo Hampton's liability to the hospital at the time it accepted payment from him. *See* **Exhibit 4.**

### B. RevClaims's Collection Efforts Throughout The State of Arkansas

21.     RevClaims is a nationwide collection agency for hospitals and health systems, community hospitals, and trauma centers which claims to assist these medical care providers in boosting revenue and reducing accounts receivable days by increasing injury claims recoveries. RevClaims has been hired by each of the Defendant medical care providers herein for that precise purpose.

22.     To perform these services, RevClaims holds itself out as having a staff team that includes attorneys and paralegals who understand the nuances of state and federal law, file appropriate liens, and negotiate on clients' behalf. RevClaims likewise holds itself out as having

on staff insurance professionals and compliance professionals who understand the intricacies of third-party reimbursement and ensure that its clients are complaint with contractural provider agreements, as well as regulations.

22.     RevClaims boasts of having an 86% recovery rate for its clients for charges for which liens are filed.

23.     RevClaims's collection procedure specifically targets victims of automobile collisions and other victims of personal injuries for which third-parties are liable.  Due to the existence of potential third-party payor sources, such victims are lucrative sources for collections, as RevClaims and the providers on whose behalves they are acting can collect funds which far exceed the providers' regular negotiated reimbursement rates.

24.     The overwhelming majority of healthcare providers' collections are from health insurance networks, Medicare, or Medicaid.  All of these sources have contractually negotiated rates for services, and, regardless of the source, the contractually negotiated rate is far below the "standard" charge for services provided.

25.     Consequently, in an effort to boost collections, RevClaims targets patients for whom third-party payor sources are available, in order to collect the "standard"—or inflated— bill for the exact same services which would lead to a greatly reduced payment if the bill were submitted to the insurer, Medicare, or Medicaid for payment.

26.     For purposes of this lawsuit, this practice of attempting to collect the "standard"—or inflated—bill for Medicaid-eligible services provided to Medicaid-eligible patients is known as "balance billing" or "substituted billing."  Under Arkansas law, this practice is illegal.

6

## C. **Arkansas' Class Members Who Obtained Insurance Through Medicaid Expansion and Adoption of the "Private Option"**

27.     In September 2013, Arkansas became the first state in the nation to receive approval from the Federal Government to enact a Medicaid expansion program aimed at eliminating the traditional "fee for service" Medicaid system previously implemented by Arkansas to provide Medicaid benefits.

28.     With approval from the Federal government, Arkansas chose to adopt the Arkansas Health Care Independence Program, commonly known as the "private option," as part of the Arkansas Medicaid program. The private option program was aimed at eliminating the "fee for service" system by requiring most adults who are eligible for coverage through Arkansas' Medicaid program to obtain Medicaid coverage in the form of a Qualified Health Plan provided through Arkansas' insurance marketplace.

29.     Thus, the private option significantly changed the administration of Medicaid benefits to Arkansans by using Medicaid funds to purchase Qualified Health Plans for Medicaid recipients through the marketplace created in conjunction with the Affordable Care Act.

30.     While the private option allowed Medicare recipients to obtain Qualified Health Plans through Arkansas' Healthcare Exchange, Medicaid recipients' cost-sharing obligations were still subject to compliance with the mandates established by Congress in enacting Medicaid and overseeing the federal proceeds used to fund state Medicaid programs.

31.     The private option simply provided a means whereby Arkansas was allowed to use state and federal Medicaid funds to purchase insurance for Medicaid recipients through the Arkansas' insurance exchange.

32.     On September 27, 2013, the Centers for Medicare and Medicaid Services (CMS) approved Arkansas' request to implement the private option, subject to the rules and limitations

7

established in the comprehensive "Special Terms and Conditions (STCs)" submitted by CMS to the Arkansas Department of Health. *See* **Exhibit 5.**

33.    Subject to the Special Terms and Conditions, Arkansas was granted the authority to proceed with implementation of the private option effective January 1, 2014, through an initial demonstration period extending until December 31, 2016.

34.    As set forth above, at the time of the events alleged herein, Tracey Scott and Lorrenzo Hampton Medicaid recipients. They received their benefits in the form of a Qualified Health Plan issued by BCBS, which was purchased with Medicaid funds pursuant to the private option.

35.    Since the adoption of the private option, nearly all Medicaid recipients in Arkansas receive Medicaid benefits through the private option, wherein Medicaid funds are used to purchase coverage for Medicaid beneficiaries through a Qualified Health Plan.

36.    BCBS, along with the other insurance carriers that provide Qualified Health Plans in Arkansas, have received substantial financial benefit through Arkansas' decision to replace the traditional Medicaid system through the use of Medicaid dollars to purchase private option plans for Medicaid recipients.

37.    According to the most recent estimates, over 93% of the Medicaid recipients in Arkansas are enrolled in the "private option" and receive Medicaid benefits in the form of a Qualified Health Plan purchased with state and federal Medicaid funds.

38.    Arkansas' adoption of the "private option" has provided a substantial increase in the number of insurance plans sold by BCBS and other Arkansas insurance providers. Thus, the "private option" has provided the insurers participating in Arkansas' marketplace significant amounts of additional revenue since its adoption in 2014.

39.     Since 2014, Arkansas health insurers have received substantial financial benefits through Arkansas' use of the "private option." From 2014 through 2016, Medicaid enrollment in Arkansas increased by 324,000 participants. Approximately 300,000 of the newly-covered Medicaid recipients receive their coverage through the purchase of Qualified Health Plans from BCBS or one of the other insurance companies approved to sell Qualified Health Plans in Arkansas.

40.     In addition to the Arkansans who were enrolled in Medicaid through the program's expansion following the enactment of the Affordable Care Act, the "private option" required the majority of Arkansans who were Medicaid recipients prior to its expansion to enroll in the private option and obtain coverage through a Qualified Health Plan funded by the Medicaid program. Thus, the vast majority of the approximately 550,000 Arkansans who were enrolled in Medicaid prior to 2014 are currently enrolled in the "private option" and covered under a Qualified Health Plan issued by BCBS or one of the other insurers who participate in Arkansas' marketplace.

41.     For 2017, Governor Hutchison recently requested and received approval from the Federal government allowing Arkansas to continue to provide Medicaid coverage to eligible Arkansas through the purchase of Qualified Health Plans for an additional four (4) years. In his request, Governor Hutchison noted that replacing the traditional "fee for service" Medicaid system through the purchase of insurance plans for indigent Arkansans has proved successful in expanding Medicaid coverage in Arkansas, noting that Medicaid enrollment grew by 69% from the end of 2013 to September 2016.

9

42.     The most recent estimates provide that an additional 250,000 Arkansans are currently eligible for Medicaid coverage through the "private option."[1] Thus, through adoption of the "private option," BCBS and the other insurers participating in Arkansas' marketplace have received the financial benefit of the privatization of the vast majority of Arkansas' Medicaid system.   In addition, the number of overall Medicaid recipients has increased dramatically. Medicaid is expected to continue expanding in Arkansas, with BCBS continuing to benefit from the expansion through increased sales of private insurance policies purchased through the use of Medicaid funds.

### D. Coverage Requirements for QHP's Under The "Private Option" And The Affordable Care Act

43.     Under the Affordable Care Act ("ACA"), all health plans sold both inside and outside of Federal or State exchanges must meet certain guidelines:  1) they must be "guaranteed issued," which refers to the designated requirement of insurance coverage that is guaranteed to be issued to applicants regardless of their health status, age, or income, and must guarantee that the policy will be renewed as long as the policyholder continues to pay the policy premium;  2) they must follow the ACA's cost/sharing guidelines; and 3) they must cover "essential health benefits" with no lifetime or annual maximums.

44.     In order to be ACA-compliant, a health plan must also be certified by the Arkansas Insurance Department and the U.S. Department of Health and Human Services as a "qualified health plan" (QHP).  Certification ensures that all plans offered by the insurer contain ACA's minimum requirements.

---

[1] In requesting approval from the federal government to continue implementing the "private option" in Arkansas, Governor Hutchison officially named the "private option" as "Arkansas Works." Although the name changed, the terms of the program remain the same.

45.     Although the "QHP" label is basically an extra layer of consumer protection that makes shopping on the exchanges a good idea even for people who do not qualify for subsidies, all plans from the spring of 2013 forward must meet the same basic policy guidelines. All plans offered on the exchanges must be approved QHPs. As a practical matter, all plans in Arkansas issued by a QHP insurer contain identical QHP provisions, unless the plan pre-dated the ACA and was grandfathered in pursuant to the terms of the ACA.

46.     In the spring of 2013, health insurance carriers in each state submitted plan designs and pricing to the exchanges which were approved and considered QHPs.

47.     All QHPs offer the same core set of benefits, including preventive services, mental health and substance abuse services, emergency services, prescription drugs, and hospitalization.

48.     QHPs are qualified and labeled by a standard coverage level to help consumers compare plans "apples to apples." The four standard coverage levels ("metallic tiers") are:

a)     Bronze: the plan must cover 60% of expected costs for the average individual;

b)     Silver: the plan must cover 70% of expected costs for the average individual;

c)     Gold: the plan must cover 80% of expected costs for the average individual; and

d)     Platinum: the plan must cover 90% of expected costs for the average individual.

49.     There are also catastrophic plans. Catastrophic plans have a high deductible and offer less coverage that the metallic tiered plans.

50.     In order to comply with the ACA's mandate, the Arkansas Insurance Department received grant money in February of 2012 to develop a partnership exchange.

11

51.     Arkansas was the first state to receive federal approval to expand Medicaid through the private option.  Through the private option, the State uses money earmarked through the ACA for Medicaid expansion to subsidize the purchase of private insurance.

52.     Under the private option, Arkansas' Medicaid program was expanded to provide premium assistance to support the purchase by beneficiaries eligible under the state plan of coverage from QHP's offered in the individual market through the Marketplace.

53.     Arkansas defined eligible adult participants as persons to include (1) childless adults with incomes at or below 133 percent of the federal poverty limit or (2) parents and other caretakers with incomes between 17 percent and at or below 133 percent of the federal poverty level. *See* **Exhibit 5.**

54.     The Special Terms and Conditions established by the Federal government specifically provided that all requirements of the Medicaid program, expressed in law, regulation, and policy statement, not expressly waived or identified as not applicable in the waiver and expenditure authority documents provided with the approval of the private option will continue to apply to Medicaid recipients whose benefits are provided through implementation of the private option.

55.     In order to satisfy this requirement, all "private-option" beneficiaries in Arkansas are required to receive coverage under a "Silver" Qualified Health Plan and a supplemental Alternative Benefit Plan (ABP).  The ABP provides Medicaid beneficiaries access to medical services required by the Medicaid program that are not included in QHPs pursuant to the Affordable Care Act.

12

56.     CMS requires that ABP services be delivered through the service delivery network of the insurer that sells each recipient's QHP and that the QHP provider be the primary payer for such services.

57.     CMS also required that Arkansas and the insurers participating in its Marketplace implement specific procedures to ensure that the Private Option complies with Medicaid's cost-sharing requirements.

58.     The Arkansas Department of Human Services and The Arkansas Insurance Department entered into a memorandum of understanding (MOU) with BCBS and all other QHP providers whereby the providers acknowledged the Special Terms and Conditions imposed on the Private Option plans and agreed to comply with all such terms.

59.     Through execution of the MOU, BCBS and other insurers participating in the Marketplace agreed to comply with all federal requirements for Medicaid cost-sharing as set forth in all applicable statutes, regulations and policies.  CMS specifically required that every Private Option plan comply with the cost sharing limitations described in 42 CFR § 447.56(a). *See id.*  CMS included a schedule of cost-sharing amounts as an exhibit to its Special Terms and Conditions, which establishes a beneficiary's maximum shared cost for the various categories of health-related expenses covered under the Private Option plans.

60.     CMS also established specific conditions for payment of premiums and additional costs QHP providers will incur through the additional payments associated with the cost sharing reductions with Private Option plans.

61.     The following health insurance carriers have all offered insurance plans since the implementation of the partnership exchange in Arkansas:  Arkansas Blue Cross Blue Shield,

Celtic Insurance Company (Ambetter), BCBS/QCA health plan (collectively referred to hereafter as "BCBS"), and United Healthcare of Arkansas.

62.     In order for the above insurers to obtain approval as a qualified health plan for purposes of participating in the market exchange, each insurer must submit each version of its metallic tiered plans and catastrophic plan to the Arkansas Insurance Department for review and approval. Once approved by the Arkansas Insurance Department, they are then submitted to the U.S. Department of Health and Human Services for approval. Thus, each plan must contain identical provisions regarding the ACA's requirements.

63.     For insurance plans already in place in Arkansas prior to the passage of the ACA, most of these plans were "grandfathered in" under the Affordable Care Act's provisions. However, for all other plans and policies issued in the State of Arkansas since the effective date of the Affordable Care Act and the establishment of Arkansas' partnership exchange, these policies must include coverage and provisions as mandated by the Affordable Care Act.

64.     Thus, the QHP is offered in identical forms under three different scenarios. First, if a person is eligible for traditional Medicaid, he or she will be enrolled in a QHP with no responsibility for premium payments under Medicaid's traditional structure. Second, for individuals not meeting the traditional Medicaid income eligibility threshold, but whose income does not exceed 138% of the State's poverty level, these individuals may obtain coverage under a QHP under Arkansas' private option marketplace, which qualifies them for subsidies for partial premium payments in the form of rebates and/or tax credits. Finally, for individuals who exceed the private option's income limitations, they may simply purchase the QHP's on their own either through the partnership exchange's website or directly from any of the QHP insurers.

65.     The Blue Cross Blue Shield Provider Agreement further states "providers are **not** permitted to 'balance bill' a member for amounts in excess of the Arkansas Blue Cross Blue Shield allowance (member copayment, coinsurance, and deductible are deemed part of the allowance for this purpose, and should be billed to the member) for covered services." *See* **Exhibit 6.**

66.     Likewise, the Ambetter Provider Agreement, as well as provider and billing manual, specifically states "Ambetter providers are prohibited from billing the member for any covered services except for copayments, coinsurance, and deductibles." Further, "if the amount collected from the members is higher than the actual amount owed upon claim adjudication, the provider must reimburse the member the overpaid amount within 45 days." *See* **Exhibit 7**.

67.     Under a separate provision entitled "no balance billing," the manual states "payments made by Ambetter to providers less any copays, coinsurance, or deductibles, which are the financial responsibility of the member, will be considered payment in full. **That is, providers may not seek payment from Ambetter members for the difference between the billed charges and the contracted rate paid by Ambetter**." *See Id.*

68.     QualChoice's Provider Agreement likewise contains a prohibition on balance billing, stating "network providers are prohibited by contract from billing the member above and beyond their normal copayment, coinsurance, and deductible. Arkansas State law also prohibits providers who are contracted with a Health Maintenance Organization from billing a member of the Health Maintenance Organization above and beyond their normal copayment, coinsurance, and deductible." *See* **Exhibit 8**.

69.    The QualChoice Provider Manual states "network providers shall not bill, charge, collect a deposit from, or seek compensation, remuneration, or reimbursement from, or have any recourse against any member or person other than QualChoice for Covered Medical Services."

## IV. CLASS ACTION ALLEGATIONS

70.    Pursuant to Ark. R. Civ. P. 23, Plaintiffs bring this lawsuit as a class action on behalf of herself and all others similarly situated.  This action satisfies the Ark. R. Civ. P. 23(a) requirements of numerosity, commonality, typicality, and adequacy of representation, and the Rule 23(b) requirements of predominance and superiority.

71.    The proposed class which Plaintiffs seek to represent is defined as follows:

a.    All persons who were insured under an Arkansas QHP and received covered services from St. Bernard's for injuries sustained in an incident for which a third party was potentially liable whose subsequent claim against that third party was impaired by the filing of a lien by Defendants for a charge for services in an amount in excess of the negotiated contract rate with the QHP insurer.

b.    All persons who were insured under an Arkansas QHP and received covered services from St. Bernard's for injuries sustained in an incident for which a third party was potentially liable which St. Bernard's and RevClaims refused to submit to the QHP for payment and instead billed the full amount to the QHP insured.

b.    All persons who were insured under an Arkansas QHP and received covered services from the St. Bernard's for injuries sustained in an incident for which first-party insurance proceeds for Personal Injury Protection benefits, med-pay benefits, underinsurance benefits, uninsurance benefits, or the like, whose claim for those benefits was impaired by the

filing of a lien by Defendants for an amount in excess of the negotiated contract rate with the QHP insurer.

        c.     All persons who were insured by a QHP and received covered services from St. Bernard's for injuries sustained in an incident for which a third party was potentially liable who were forced to pay, had paid on their behalf, or are being asked to make payment for charges for medical care and services in an amount that violates St. Bernard's Admission Assignment Agreements and/or exceeds the co-payment, co-insurance, and/or deductible obligation for said persons and/or the terms of the Provider Agreements to treat and bill such persons pursuant to the terms of such agreement.

        d.     All persons who were insured by an Arkansas QHP and received covered services from St. Bernard's for injuries sustained in an incident who did not receive the benefit of collection by Defendants as an Attorney-In-Fact for medical services from a source or sources most favorable to the clients among the sources known to the Defendant acting     as an Attorney-In-Fact;

        e.     All persons who were insured by an Arkansas QHP and received covered services from St. Bernard's for injuries sustained in an incident who were not refunded amounts received by Defendants in excess of amounts due for medical care and services provided by Defendant healthcare provider to said persons;

        f.     All persons who were insured by an Arkansas QHP and received covered services from St. Bernard's for injuries sustained in an incident who were sent collection notices by Defendants that contained misleading statements of facts and misrepresentations regarding their accounts with St. Bernard's.

    72.    Excluded from the class are:

a. All persons who receive no monies from any third party against whom their liability claims are pursued, either through settlement, judgment, or otherwise:

b. All persons whose bills from the Defendants were ultimately paid in full by QHP insurer and accepted by the Defendants as payment in full;

c. All persons who were only billed by the Defendants for a deductible, coinsurance, or co-payment as permitted by the QHP Provider Agreement;

d. The Defendants and their affiliates, officers, directors, agents, and employees;

e. Members of the judiciary and their staff to whom this action is assigned;

f. All persons who received no monies from any third party against whom their liability claims were pursued, either through settlement, judgment, or otherwise;

g. All persons whose bills subject to liens by St. Bernard's were ultimately paid in fact by an Blue Cross Blue Shield, Ambetter, BCBS/ QCA, and United Healthcare;

h. All persons who were only billed by St. Bernard's and/or RevClaims for a deductible, coinsurance, or co-payment as permitted by the insurer's Provider Agreements and Manuals;

i. All persons whose health insurance plans were not approved QHPs or were grandfathered in under the grandfather provision of the ACA;

j. All persons with QHPs fully subsidized by traditional Arkansas Medicaid as identified Class Members in *Lacey Robinett v. Shelby County Healthcare Corporation, et al.*, No. 3:16-cv-00188 (E.D. Ark. 2016) and *Tammy Hargett v. RevClaims, LLC, et al.*, No. 3:16-cv-00200 (E.D. Ark. 2016) incorporated by reference herein; and

k. Plaintiffs' counsel.

18

Plaintiffs reserve the right to amend the definition of her Class as discovery in the case reveals whether the case should be so amended, including the addition of appropriate sub-classes or the expansion of the class to Medicare patients and/or patients residing in other states whose residents the Defendants routinely treat.

73.     The members of this class are so numerous that joinder of all members is impracticable.  Plaintiffs reasonably believe that hundreds, if not thousands, of Arkansas citizens geographically dispersed across Arkansas have been damaged by Defendants' actions.   The names and addresses of the members of the class are identifiable through records maintained by the Defendant, and Class Members may be notified of the pendency of this action by mail, published, and/or electronic notice.

74.     Common questions of law and fact exist as to all Class Members and predominate over any questions affecting only individual Class Members.   The questions of law and fact common to the class, include, but are not limited to:

a.     Whether Arkansas and federal law permit the Defendants to collect bills directly from QHP-insured individuals, in lieu of submitting bills to the insurers for covered services;

b.     Whether the contractual language of the provider agreement permits the Defendants to collect bills directly from QHP-insured individuals, in lieu of submitting bills to insurers for contracted services;

c.     Whether the Defendants' efforts to enforce statutory liens against QHP-insured individuals' cause(s) of action against third parties constitutes an effort to bill and receive payment from QHP insureds as prohibited by ACA and the Provider Agreements;

       d.      Whether the Defendants' efforts to enforce statutory liens against the QHP-insured individuals' cause(s) of action against third parties constitutes an effort to recover payment from a QHP insureds in excess of the negotiated rate for services that they have agreed to accept as payment in full from the respective QHP insurer;

       e.      Whether Defendants have been unjustly enriched by their policies and practices by retaining money that should not have been received from the Plaintiffs and other Class Members as described herein;

       f.      Whether Defendants have breached their Assignment Agreements with the Class Members by refusing to submit their bills for covered services to the QHP insurers for payment;

       g.      Whether Defendants have converted funds to which QHP-insured individuals are entitled to possess;

       h.      Whether Defendants breached their contract with BCBS and other QHP insurers thus depriving these insurer's insureds of intended contractual benefits;

       i.      Whether Defendants have breached their fiduciary duties owed to Plaintiffs and Class Members as their Attorney-In-Fact;

       j.      Whether Defendants conspired to violate Arkansas law and impair QHP insureds' legal rights through their practice and policy of enforcing statutory liens against QHP insureds for covered services in lieu of submitting bills for these services to the QHP insurers; and

       k.      Whether Plaintiffs or other Class Members have been damaged by the Defendants' breaches, as alleged herein and, if so:

              1.      What is the nature and extent of those damages; and

> 2.      What relief should be awarded to Plaintiff and other Class
>
> Members.

75.      Plaintiffs' claims are typical of the claims of all Class Members, as they are all similarly affected by Defendant's custom and practice of unlawful and unjust conduct, and the claims are based on such conduct.  Further, Plaintiffs' claims are typical of the claims of all Class Members because her claims arise from the same underlying facts and are based on the same factual and legal theories.  Plaintiffs are no different in any material respect from any other member of the class.

76.      Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class.  Plaintiffs' interests do not conflict with the interest of the class she seeks to represent.  Plaintiffs have retained counsel who are competent and experienced in class action litigation, as well as including insurance and healthcare-related cases.  Plaintiffs and their counsel will prosecute this action vigorously.

77.      The class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Joining all Class Members in one action is impracticable and prosecuting individual actions is not feasible.  The size of the individual claims is likely not large enough to justify filing a separate action for each claim.  For many, if not most Class Members, the class action is the only procedural mechanism that will afford them an opportunity for legal redress and justice.  Even if Class Members had the resources to pursue individual litigation, that method would be unduly burdensome to the Courts in which such cases would proceed. Individual litigation exacerbates the delay and increases the expense for all parties, as well as the Court system.  Moreover, individual litigation could result in inconsistent adjudications of common issues of law and fact.

78.     In contrast, a class action will minimize case management difficulties and provide multiple benefits to the litigation parties, including efficiency, economy of scale, unitary adjudication with consistent results and equal protection of the rights of the Plaintiffs and Class Members.  These benefits would result from the comprehensive and efficient supervision of the litigation by a single Court.

79.     Class certification is further warranted because Defendant has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief for corresponding declaratory relief is appropriate respecting the class as a whole.

## COUNT I – BREACH OF CONTRACT

80.     Paragraphs 1-79 are incorporated herein by reference as set forth word for word.

81.     Upon acceptance of the patient by St. Bernard's and as a condition of their treatment with Defendants, Tracey Scott and Lorrenzo Hampton assigned the Defendants all rights belonging to them as a QHP beneficiary of a contract with Arkansas Blue Cross Blue Shield.  This included an assignment of benefits authorizing Defendants to bill their insurer for medical services provided to both Scott and Hampton.

82.     The Assignment Agreement assigns to Defendants all of Tracey Scott's and Lorrenzo Hampton's rights to payment for medical bills members of BCBS's QHP policy.

83.     The Assignment Agreement restricts both Scott's and Hampton's personal responsibility for payment only for charges "not paid pursuant to the above assignment of insurance benefits."

84.     As a member of BCBS's QHP policy, medical care providers such as Defendants are prohibited from billing QHP participants directly for bills which are covered services under the negotiated agreement with BCBS.  This condition is included in BCBS's provider agreement

and was accepted by Defendants when it accepted both Scott's and Hampton's assignment of rights under the Assignment Agreement.

85.     Rather than adhering to its contractual and statutory responsibility to bill BCBS for the treatment provided to Scott and Hampton, the Defendants directly billed and collected from its patients amounts which exceeded the agreed upon reimbursement rates.     The Defendants, therefore, breached the contract with both Scott and Hampton by opting to collect from Scott and Hampton directly a sum of money that substantially exceeded the scheduled rate for the services received.

86.     The Defendants and Tracey Scott had a valid and enforceable contract under the Assignment Agreement.

87.     The Defendants and Lorrenzo Hampton had a valid and enforceable contract under the Assignment Agreement.

88.     The contract assigned to Defendants all rights belonging to both Scott and Hampton as BCBS QHP insureds.  Both Scott's and Hampton's status as BCBS QHP insureds not only authorizes payment for all covered services, but prohibits healthcare providers from billing patients such as Scott and Hampton directly for these services in excess of cost-sharing amounts.

89.     Tracey Scott and Lorrenzo Hampton did what the contract required of them by assigning their rights to Defendants and by providing the Defendants all information needed to submit their bills to BCBS.

90.     The Defendants did not do what the contract required of them by billing both Scott and Hampton directly for the inflated charges for these services which greatly exceeded the

agreed upon reimbursement rate.  Defendants' actions constitute a breach of contract, resulting in financial harm to both Scott and Hampton and other Class Members as outlined herein.

91.     The Defendants breached the contract created by the Assignment Agreement with Tracey Scott and Lorrenzo Hampton and have caused the Plaintiffs and other Class Members damages as a result.

92.     In addition, in the performance of contractual obligations, Arkansas law implies a promise between the parties that they will act in good faith and deal fairly in performing and enforcing their obligations under the contract.  Stated another way, the law implies a promise between the parties that they will not do anything to prevent, hinder, or delay the performance of the contract.

93.     In breaching the contract with Scott and Hampton, the Defendants have taken affirmative actions to prevent, hinder, and delay the performance of its contract with Ms. Scott, Mr. Hampton and the Class Members.  Such actions are additional evidence of Defendants' breach of the contract.

94.     As a result of the Defendants' unlawful breach of contract, the Plaintiffs and the Class Members have been damaged for an amount more fully set forth below and for which the Defendant is jointly and severally liable.

### COUNT II – BREACH OF CONTRACT AS THIRD PARTY BENEFICIARY

95.     Paragraphs 1-94 are incorporated herein by reference as set forth word for word.

96.     Defendants, including their subsidiaries and affiliates, entered into Provider Agreement contracts with Blue Cross Blue Shield, Ambetter, QualChoice, and United Healthcare. *See e.g.,* **Exhibits 6-8**.  The terms of these contracts require that Defendants comply

with all billing rules and regulations as outlined in the applicable provider manuals, Arkansas statutes, and other laws implementing the ACA in the State of Arkansas.

97.     The contracts clearly are intended to benefit insureds such as Plaintiffs and other Class Members under the terms of the contract.

98.     The contracts required Defendants to bill all covered services for insured individuals such as Plaintiffs and other Class Members to the respective insurer for payment in lieu of billing the patient directly for its charges or billing any charges in excess of the negotiated contract rate between Defendants and the insurers for these services.

99.     Plaintiffs and the Class Members did what the contracts required of them by assigning all rights belonging to them as insured individuals to Defendants in exchange for Defendants providing services to them.

100.    St. Bernard's, acting through its agent RevClaims, did not do what the contracts required of it by, instead of sending its bills for services provided to the patient's insurer for payment, filing a lien which encumbered Plaintiffs' and the Class Members' third party liability claims and ultimately acted as a bill directly sent to them for services provided to them in an amount in excess of that which was agreed upon between Defendants and the insurers for these covered services.

101.    Defendants, in contracting with RevClaims and Avectus to perform their bill collection against Plaintiffs and Class Members, assigned their contractual rights and responsibilities under their Provider Agreements to RevClaims and Avectus, respectively.

102.    As such, Defendants have breached the Provider Agreements and have caused the Plaintiffs and other Class Members damages as a result.

103.    In addition, in the performance of contractual obligations, Arkansas law implies a promise between the parties that they will act in good faith and deal fairly in performing and enforcing their obligations under the contract. Stated another way, the law implies a promise between the parties that they will not do anything to prevent, hinder, or delay the performance of the contract.

104.    In breaching their contracts with Arkansas QHP insurers, Defendants, through their agent RevClaims, have taken affirmative actions to prevent, hinder, and delay the performance of their contracts to the detriment of third party beneficiaries such as Plaintiffs and the Class Members. Such actions are additional evidence of Defendants' breach of the contract.

105.    As a result of the Defendants' unlawful breach of contract, the Plaintiffs and the Class Members, as third party beneficiaries, have been damaged for an amount more fully set forth below and for which the Defendants are jointly and severally liable.

## COUNT III - VIOLATION OF THE ARKANSAS DECEPTIVE TRADE PRACTICES ACT

106.    Paragraphs 1-105 are incorporated herein by reference as set forth word for word.

107.    Plaintiffs and Class Members are "persons" entitled to protection under the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101, *et. seq.*

108.    Defendants have engaged in unconscionable and false deceptive acts and practices of business as described above. Despite being aware that Plaintiffs are BCBS insured, Defendants have not only refused to submit bills for Scott's and Hampton's service to BCBS, they attempted to bill directly to Scott and Hampton.

109.    Defendants, through their agents and employees, have engaged in unconscionable and false deceptive acts and practices of business as described above. Despite being aware that

Plaintiffs are QHP insured, the Defendants attempted to bill Scott and Hampton directly for these services rather than submit them to BCBS for payment.

110.    Defendants knowingly engaged in a scheme and artifice to defraud the Plaintiffs and Class Members, made untrue statements of facts, omitted to state material facts necessary in order to make previous factual statements, in light of the circumstances in which they were made, not misleading, and engaged in acts and practices in courses of business which operated as a fraud and deceit upon the Plaintiffs and Class Members.  The actions are unconscionable, false, and deceptive in the practice of business and, thus, they are in violation of Ark. Code Ann. § 4-88-107.

111.    Defendants' conduct proximately caused Plaintiffs and Class Members to suffer damages as set forth herein, as well as reasonable attorney's fees and costs of litigation pursuant to Ark. Code Ann. § 4-88-113(f).

112.    The improper actions of the Defendant have caused the Plaintiffs and Class Members to suffer damages in excess of that required for federal diversity jurisdiction.

**COUNT IV - UNJUST ENRICHMENT**

113.    Paragraphs 1-112 are incorporated herein by reference as set forth word for word.

114.    The Defendants' conduct, as described above and as more specifically alleged in this count, also constitutes unjust enrichment, for which Plaintiffs and other Class Members are entitled to pursue equitable remedies in accordance with Arkansas law.

115.    By directly billing for amounts in excess of contractually-negotiated rates against QHP insureds as more fully described above, Defendants have received payment in excess of that to which they were legally entitled as a result of the provider agreements.

116. Defendants' actions were unjust and inequitable in that they received far more than that which they were entitled to receive for their services as required by its contract with BCBS and other QHP insurers, the Provider Manuals, and Arkansas statutes and regulations.

117. Defendants' actions were unjust and inequitable in that they failed to disclose to Plaintiffs and other Class Members that they were required to accept as payment in full payment from the QHP insurers for the discounted rate for the services provided to these QHP insureds for these covered services.

118. Defendants' actions were unjust and inequitable in that Defendants concealed from Plaintiffs and other Class Members that they were receiving more than they were legally permitted to receive.

119. Defendants' actions were unjust and inequitable in that Defendants concealed from Plaintiffs and other Class Members that they were not permitted to bill QHP insureds directly for the Defendants' services or to "balance bill" QHP insureds.

120. Defendants' actions were unjust and inequitable and the Defendants owed a fiduciary duty to, and/or had a special relationship with, Plaintiffs and other Class Members.

121. As a result of Defendants' unjust and inequitable actions, Defendants were unjustly enriched by receiving something of value to which they were not entitled. More specifically, Defendants retained, and had the beneficial use of, money that Plaintiffs and other Class Members were entitled and should have received.

122. As a result of their unjust and inequitable actions, Defendants were unjustly enriched by receiving money under such circumstances that, in equity and good conscious, they ought not retain.

123.    In light of the foregoing, Plaintiffs and other Class Members are entitled to restitution and other equitable relief.

## COUNT V - CONVERSION

124.    Paragraphs 1-123 are incorporated herein by reference as set forth word for word.

125.    The Defendants intentionally took and exercised dominion and control over funds to which Plaintiffs and Class Members were entitled by asserting claims against their third party liability claims which prevented them from receiving settlement funds to which they were otherwise entitled.

126.    The Defendants intentionally took and exercised dominion and control over funds to which the Plaintiffs and Class Members were entitled to retain by billing and collecting from them monies to which Defendants were not lawfully entitled to recover in violation of the Plaintiffs' and Class Members' rights.

127.    The Defendants' actions as described above constitute a conversion of the funds to which the Plaintiffs and Class Members were entitled to possess.

128.    As a result of the Defendants' unlawful conversion of Plaintiffs' funds, the Plaintiffs and Class Members have been damaged in an amount more fully set forth below.

## COUNT VI – BREACH OF FIDUCIARY DUTY

129.    Paragraphs 1-128 are incorporated herein by referenced as set forth word for word.

130.    As a result of the relationship between Plaintiffs, the Class Members, and the Defendants, including the Defendants' role as Attorney-In-Fact as the assignee of Plaintiffs' Medicaid beneficiary and QHP insured's rights under the Assignment Agreement, a fiduciary relationship exists between the Plaintiffs, the Class Members, and the Defendants.

131.    Among the fiduciary duties owed by Defendants to Plaintiffs and members of the Class is the duty to act on Plaintiffs' behalf and in Plaintiffs' best interests in seeking payment from available sources from Medicaid and QHP insurers which was available to Plaintiffs and members of the Class.

132.    Defendants breached their fiduciary duties by, among other things, communicating false information to the Plaintiffs and Class Members regarding the amount of charges owed for medical care and services provided by the Defendants, wrongfully, deceptively, and improperly charging Plaintiffs and Class Members for medical care and treatment that greatly exceeded the agreed-upon QHP reimbursement rates, failing to refund amounts received in excess of the amounts allowed pursuant to the Provider Agreements and QHP Policies, pursuing collection policies and practices which put the Defendants' financial interests ahead of the Plaintiffs' and those of the Class Members', failing to pursue collection from sources favorable to Plaintiffs and Class Members, and altering and modifying their billing and charges to enable collection from sources more favorable to the Defendants but less favorable to the Plaintiffs and Class Members than otherwise were available.

133.    The Defendants breached their fiduciary duties owed to the Plaintiffs and Class Members in a manner that sought to benefit the Defendants and did, in fact, benefit Defendants.

134.    The Defendants' breach of fiduciary duties owed to the Plaintiffs and Class Members proximately caused damages to the Plaintiffs and Class Members as more fully set forth herein.

135.    Plaintiffs demand a trial by jury on all issues.

WHEREFORE, Plaintiffs Tracey Scott and Lorenzo Hampton, Individually and On Behalf of Other Similar Situated, requests that the Court grant the following relief:

a.   Certify that this lawsuit may be prosecuted as a class action pursuant to Rule 23 of the Arkansas Rules of Civil Procedure;

b.   Appoint Plaintiffs and Plaintiffs' counsel to represent the class;

c.   Declare that the Defendants have violated the Arkansas Deceptive Trade Practices Act;

d.   Declare that the Defendants have been unjustly enriched as a result of their wrongful conduct;

e.   Declare that the Defendants have improperly converted funds belonging to the Plaintiffs and the Class;

f.   Declare that the Defendants have abused the legal process in Arkansas;

g.   Declare that the Defendants have engaged in a civil conspiracy and acted in concert in committing the actions above;

h.   Award the Class damages in an amount equal to all amounts improperly billed to the Class and recovered through filing liens;

i.   Award the Class pre-judgment and post-judgment interest;

j.   Enjoin the Defendants from engaging in the unlawful and unjust conduct complained of herein;

k.   Award the Class reasonable attorney's fees and costs; and

l.   Award the Class any and all other additional relief to which the Plaintiffs sand other Class Members may be entitled.

Respectfully Submitted,

Brandon W. Lacy #03098
LACY LAW FIRM
630 S. Main Street
Jonesboro, Arkansas 72401
870-277-1144

-and-

Jeffery O. Scriber, #2006526
JEFF SCRIBER, P.A.
324 S. Main Street
Jonesboro, AR 72401
870-336-0155

Attorneys for Plaintiff

By:    _____
        Jeffery O. Scriber, #2006526